Good morning, members of the panel, Mr. Wieland. My name is John Lambrose. I'm here on behalf of Mr. Bruce Franzen, petitioner and appellant. I think the best place to start is the standard of review, obviously, and the standard of review was conceded essentially by the lower court to be Brecht v. Abrahamson, that there's no deference owed to the Nevada Supreme Court's decision because they used the wrong standard, the wrong harmless error standard. They applied a sufficiency of the evidence standard. So once we pretty much set the table there, this Court's obligation is to tease out the record and to make it, as Justice Stevens said in Kodiakos, a nuanced and painstaking determination as to how the error affected any one of the jurors' verdicts. Decision to vote guilt, any one of the jurors, not the entire jury. And I think that's an important consideration and that's something that this Court pointed out in the Valerio decision. The error is compelling. Judge Reed and the Court below pointed out and the State in their briefing have obviously conceded that there were at least 12 and perhaps 13 instances of prosecutorial misconduct affecting Judge Reed's harmless error analysis. Nine of those episodes of misconduct occurred in the 25 pages of transcript that comprised Mr. Oakes' first closing. The other three occurred in his 18 pages of rebuttal argument. So we have 13 instances of profound prosecutorial misconduct occurring in not even 45 pages of transcript. Well, since your time is limited, let me just ask a question. You attempt to draw a comparison with McKinney v. Rees, where this Court held that the dearth of guilt suggested unfair trials. Now, here, assuming the prosecutor did commit errors, wasn't there a plethora of evidence about the guilt of your client? The evidence that Judge Reed relied on to make his nuanced and painstaking decision comprised of the defendant was in Room 9 on March 8th, the day before the murder occurred. Well, that evidence and that he tried to leave after the victim's body was discovered. That evidence is, number one, it kind of misstates the record. He was certainly in Room 9, but he didn't try. What he did is he went in, he walked down the stairs, he slid his hand along the railing, which becomes important in a minute. Because it's metal. Which is metal. Right. And he hands the key to the police officer, because there's nobody in the office. And then he's just ready to leave. So why would anybody who's worried about having, you know, to flee the scene of a murder that occurred by the prosecution's own theory of the case, almost 24 hours earlier, why would that person go hand the key to his room to the police officer that's investigating a murder homicide? Well, I think one of the questions I have, and maybe it's along the lines of Judge Nelson, is, you know, if you take each individual item, you can come up with a contrary explanation, as you have done. But when you take the hair, the styrations, his whole kind of connection to the hotel, his bruised hands, and then you take that cumulative evidence, it seems to me that's what we have to benchmark these prosecutor's statements against. Absolutely. And so it would help, I think, if you could address really what looked to me to be quite significant evidence that was against your client on the merits. Okay. Let's talk about the hand injuries. The hand injuries by the pathologist's own testimony, and coincidentally, and I think it worked in Mr. Franzen's favor, although it wasn't, you know, it wasn't argued as well as I'm going to, you know, without hindsight, 28 years later being what it is. It's Dr. Sohn, the pathologist, examined Bruce on March the 12th and told and testified to the jury that those injuries were sustained two to three days earlier. Now, that's an important fact, and that's in the record at page 400, the excerpts of record. That's an important fact because the State's theory of when the murder occurred was anywhere from 42 to 28 hours prior to Bruce's examination. So those hand injuries occurred before the homicide by the State's own theory. So I think you just have to discount the hand injuries as any kind of tie to the homicide. And to me, that is a very important fact. The other thing is the hair. And the hair on the decedent's back matches the hair of your client on her back of her legs. The hair evidence How did hair get there? The hair evidence, well, now, remember, Franzen was in room 9 on March the 8th. That was his room. He checked out and checked back in on March the 10th and checked into room 27. There were only, of the many, many, many hairs that were found in that room, in close proximity to Mrs. Fields, there were only four hairs that grossly, and this is like almost, as far as I'm concerned, with all due respect, junk science. This is 1983 science saying that Mr. Franzen's hair that was plucked from him grossly resembled the hair at the crime scene. Now, in addition to that, there were On the decedent's back. One on the decedent's back and one in the waistband of the decedent's pants. But in addition to that, and I think this is really important, Judge Thompson, because you have to overlay that on, you know, by I think it was Detective Haphazard, that's an interesting name, but by his own testimony, he said that the hair comparison analysis was very subjective at page 602. That was his testimony. And that it, you know, that it would, that it was, that the hair could not be said to exclude, you know, other human beings. What he was saying was there was hair there very close to the victim that was not the victim's hair and not consistent with Franzen's hair. So, you know, that's, to me, that's evidence, that's circumstantial evidence that cuts two ways. So the hair evidence, I think, is. I mean, I think the fact that the victim was in the room could, you know, from time to time, be somebody else's hair. Exactly. It could have been somebody else's hair. And it, you know, very well could have been Bruce Franzen's hair because he was in the room. And there was evidence that the victim had been dragged along the floor. So it could have been his hair from when he was in there on March the 8th. Because it was very close to the vanity and there was evidence that, you know, it could have been combed while somebody was combing their hair, that kind of thing. So the hair evidence, I think, is a real red herring. And then, you know. We have no DNA or anything of that. No, we don't. The trace metal detection test was, in my opinion and in Professor Nelson's opinion, the professor from the University of Nevada, chemistry professor for 30 years, whose testimony said it was a total farce. I mean, those are my words. But if you read his testimony at pages, at Exhibit 278, pages 3 through 26, which I think the Court must be interested in since they asked for, since this Court asked for a briefing on the procedural default issue, his testimony totally discounts haphazard's opinion that the trace metal detection test was a result of Franzen grabbing a hanger and strangling the victim. And, you know, the reason that, first of all, the trace metal only showed up on his left hand. It didn't show up on his right hand. And he was right-handed. So in order for Franzen to have committed this crime by strangling, you had to believe hazard's testimony that he grabbed the hanger, twisted it in half, and strangled the woman like that, as opposed to like that. And to me, that's like, it just doesn't make any sense. So that, coupled with the fact that the scientific evidence completely discounts haphazard's testimony that Franzen grabbed the hanger, what Professor Nelson said was that it was more consistent with Franzen walking down the railing and holding the railing. So, you know, to me, the trace metal detection evidence, the jury shouldn't have even heard. It shouldn't even come into this nuanced painstaking analysis that the Court needs to make today. Would you like to reserve the remaining time? Oh, yes, I would. Thank you. May it please the Court and Counsel, my name is Robert Whelan. I'm a Senior Deputy Attorney General employed by the Office of the Attorney General of the State of Nevada. I have the privilege of representing the respondents in this particular matter. Counsel has said that we've conceded all manner of misconduct,   and the use of force, and the use of force, we have not made any such concession at all. Counsel has made a variety of representations that are simply. You're not going to stand here and say that some of what occurred in this trial with the prosecutor was not misconduct, are you? Such as, in the years I've done this, no innocent person has ever been convicted. What I'm saying is, is that Counsel represented that we conceded that everything was misconduct. We have not done that. But you did concede there was misconduct. That particular statement would be misconduct. That, and a number of other statements, as I understand your brief. Well, the Nevada Supreme Court found other statements misconduct. The issue that's before this Court is with respect to the statements, whether this Court considers them to be misconduct or not, is in the context, has to look at it in the context of the entire trial, the effect that it had on the verdict in that particular case. And in this particular case, Mr. Lambrose has talked about evidence that was brought out after the trial, that by the professor who supposedly discounted the trace metal evidence. That's not germane to the issue that's before this Court at this point in time. Because the Supreme Court dictates that you look at the statements in the context of the entire trial. Whatever happened after the trial is of no consequence. That being the case, regardless of whether or not these statements are improper, one must look at the jury instructions that were given in this particular case. The jury instructions stated specifically that no inference could be drawn from the defendant's failure to testify, that the defendant's guilt or innocence was to be determined solely by the evidence in this particular case. That was reiterated a number of times. The prosecutor himself, in his remarks, stated that the jury was to be guided by the facts, and that his comments was not testimony. You have to look as well as the defense counsel's comments, his statements, that the jury was to be guided by the facts. His statements and the misconduct the defense counsel made, referring to it as a tirade, the lynch mob comment, the fact that it was an unpardonable sin to convict an innocent man, his circumstantial evidence analogy in which he concluded that killing your dog is, it's just beyond you. Let me just get this argument straight. You're basically saying you think somehow the, some of the defense's colorful arguments basically wipe out or level the playing field? In the context of the entire trial, Your Honor, the defense comments can be considered. The defense comments with respect to his own personal opinions, with respect to Franzen's guilt, with respect to the nature and quality of the evidence, are things that this Court has to consider in determining the effect of the prosecutor's comments. The evidence itself, this Court has asked Mr. Lambrose with respect to the evidence. It's very important that this Court consider the timing of the events in this particular case. The last time the victim was seen alive was approximately March 10, between 6 and 6.30 when Mr. Mortara left her at the hotel. Mr. Franzen had been in room 9. He thereafter changed and went to room 27. Somebody left a Do Not Disturb sign on room 20, or excuse me, room 9. The hairs, the location of the hairs on the body inside the pants. Mr. Lambrose is trying to say that, you know, well, it's chunk science. Well, the jury was presented with the evidence and the cross-examination of the state's hair expert in this particular case, and they decided apparently that it's worthy of consideration and belief. What Mr. Lambrose thinks of it is of no moment at all. The trace metal test, again, not counting what you can't consider what occurred after the trial, the trace metal test showed striations of a similar pattern, a similar diameter, width, as being consistent with the hanger that was used to strangle the victim in this particular case. It was on the left hand. There was testimony at the trial, an explanation at trial. Why not on the right hand, too, if you had to use both hands? Well, defense counsel said that Mr. Franzen was right-handed and the body was washed down, the explanation being to remove trace evidence perhaps of semen and other stuff. But nevertheless, the hairs on the body were consistent with Franzen's head hair, grossly consistent, in diameter, color, pigmentation, the nature of the pigmentation, the structure. The jury heard all of that evidence. The bruises on Franzen's hand were consistent, not only in the timing of the fact that they were raised, but in the timing of the homicide. Mr. Lambrose says, well, you've got to discount that, and the source of the bruises had to occur prior to the homicide. Well, that's not the case. The testimony was, well, they thought that Dr. Sohn's testimony was, could occur within this range. And guess what? The victim's homicide is within the range of time that those bruises, the source of those bruises, the cause of those bruises could have been. So that you have all of this evidence, the plethora of evidence, in particular the rooms, that shows that the defendant's in fact guilty. That being the case, you can't say that these comments had a substantial and injurious effect on the jury's verdict. The jury was instructed innumerable times in the instructions to consider the ---- Is it harmless beyond a reasonable doubt? Correct is a substantial and injurious effect. That's a different standard than the Chapman standard. Okay. But based on the evidence, based on the prosecutor's own comments, say, including the jury instructions, consider just the evidence. The jury instructions saying consider just the evidence. Both counsels' admonitions, repeated admonitions to the jury, consider the evidence. Use only the evidence. The fact that the jury was instructed, you cannot draw any inference from the defendant's failure to testify. All militate and negate the argument that the counsel's statements, even if they were improper, had a substantial and injurious effect on this jury's verdict. If you have any other questions, I'd be happy to answer them. It appears not. Thank you. Thank you very much. Mr. Lambrose. Thank you very much. Counsel, I have a question in response to opposing counsel. Professor Nelson, however good his name, testimony was after trial. What is your response to that? Well, it was ---- obviously it was after trial. And I have to concede that the jury didn't hear that evidence. But the reason I'm pointing it out is that the Nevada Supreme Court was so persuaded by that evidence that although they didn't find it to be evidence enough of actual innocence under their ---- under Schlup v. Delo, the court did say that even if you subtract that evidence, and we will subtract that evidence out of the mix, you still have the hair evidence and the bruises on the hand. So that's what the Nevada Supreme Court said in post-conviction. All right. Thank you. Now, one thing I really ---- I need to emphasize that context is very important here, because John Oakes was just a bombastic prosecutor during that period of time. In fact, as we pointed out in my ---- in the opening brief, he was sanctioned by the Nevada Supreme Court in the McGuire case. The Nevada Supreme Court mentions that in the Franzen decision. Oakes ---- No, you may not. You may sit down. Thank you. It's in the record. I wouldn't mistake the record. Oakes started his closing argument out by saying, you know, I have a reputation with the defense bar as a rude, arrogant, and demeaning lawyer. And then he went on to prove it. Now, you know, I'm not ---- I'm not saying that that is an automatic reversal, but I would really invite this Court to take a long look at footnote 9 in Breck v. Abrahamson, because Chief Justice Rehnquist dropped that footnote for a reason. And what he said in that footnote was, if we ever have a situation where there is serial instances of prosecutorial misconduct in the course of a trial, then perhaps the Court would review that case for automatic error. Now, I'm saying that this is that kind of case. And we briefed that. It's in my opening brief. Obviously, if the Court does not want to do that, then I think that we've made a case for substantial and injurious effect on the jury's verdict. Thank you. Your time has expired. We appreciate the argument this morning. The case of Franzen v. McDaniel is submitted.
judges: Nelson D. W., Thompson, McKeown